## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **BRENT ALLEN MORRIS,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )    **Case No. 22-CV-0091-CVE-SH** |
| | ) |
| **CARRIE BRIDGES, Warden,** | ) |
| | ) |
| **Respondent.** | ) |

## OPINION AND ORDER

Before the Court is petitioner Brent Allen Morris's petition for writ of habeas corpus under 28 U.S.C. § 2254 (Dkt. # 1).[1]  Morris challenges the lawfulness of his custody under the judgment entered against him in Tulsa County District Court Case No. CF-2016-6899.  Having carefully considered the petition, the response (Dkt. # 14), the reply (Dkt. # 48), the record of state court proceedings (Dkt. ## 14, 15, 16), and applicable law, the Court finds and concludes that the petition shall be denied.

### BACKGROUND

Morris and Charis Clopton began dating in April 2015.  Dkt. # 15-14, Tr. Trial vol. 3, at 12 [434].[2]  The relationship was "off and on," and Clopton obtained a protective order against Morris in February 2016, after Morris "ripped out" Clopton's insulin pump, a device used to

---

[1] Because Morris appears without counsel, the Court liberally construes his petition and reply.  Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).  The Court does so without searching the records for facts to support his claims or creating arguments on his behalf.  Id.; Childers v. Crow, 1 F.4th 792, 798 n.3 (10th Cir. 2021).

[2] The Court's citations refer to the CM/ECF pagination.  However, when citing to transcripts of state court proceedings, the Court's citations first refer to the CM/ECF pagination then refer, in brackets, to the original pagination if the original pagination differs from the CM/ECF pagination.

stabilize her Type I diabetes. Id. at 12-14 [434-36], 182-88 [604-10]; Dkt. # 15-13, Tr. Trial vol. 2, at 151-52 [309-10]. Despite the protective order, Morris and Clopton continued their relationship. Dkt. # 15-14, at 16-57 [438-79]. On July 17, 2016, Morris physically assaulted Clopton and "punched out [the] passenger side window" of her car while the two were at the home of a mutual friend, Conor McGee. Id. at 17-43 [439-65].[3] Clopton filed a police report three days later, and photographs were taken of her injuries and the damage to her car window. Id. at 225-27 [647-49]; Dkt. # 16 (State's Exs. 73-77).[4] On July 23, 2016, Clopton was at a bar when Morris showed up, uninvited, sat down with Clopton and her friends, and "just stared at [Clopton]. Dkt. # 15-14, at 32-36 [454-58]. Morris insisted on driving Clopton to her house and, when they arrived, Morris took Clopton's phone from her and refused to leave. Id. at 35-37 [457-59]. After Clopton twice set off her panic alarm, Morris became verbally abusive, shattered her phone, smashed the panic alarm, physically assaulted Clopton, and broke her television and other personal belongings. Id. at 37-40 [459-62]. Police officers responded to the alarm and found Morris hiding in the attic above Clopton's garage. Id. at 246-55 [668-77], 259-60 [681-82].

On the evening of December 8, 2016, Clopton attended a surprise party for her friend at the Mercury Lounge. Id. at 58-59 [480-81]. Before driving to the party, Clopton spoke with Morris at McGee's house; she did not recall whether she discussed her plan to attend the party, but she left McGee's house with Morris's credit card. Id. at 64-65 [486-87]. Morris later showed up to the party, uninvited, purportedly to pay Clopton's bar tab. Id. at 68 [490]; Dkt. # 15-13, at 234

_____

[3] Using her cell phone, Clopton made an audio recording of the July 17, 2016, altercation, and that recording was admitted and played for the jury at Morris's trial. Dkt. # 15-14, at 22-29 [444-51]; Dkt. # 16 (State's Ex. 155).

[4] Detective Katherine Still interviewed Morris about the July 17, 2016, altercation on September 29, 2016, and the videotaped interview was admitted and played for the jury at Morris's trial. Dkt. # 15-14, at 221 [643], 232-36 [654-58]; Dkt. # 16 (State's Ex. 163).

[392], 244-45 [402-03]. Clopton and Morris made eye contact but did not speak to each other, and Clopton drove home alone. Dkt. # 15-14, at 68-69 [490-91]. On December 10, 2016, Clopton's father found her lying on her kitchen floor in a pool of her own blood and barely breathing. Dkt. # 15-13, at 102 [260]; Dkt. # 16 (State's Exs. 1, 3). First responders noticed that the house was in disarray and saw a mixture of blood and hair on several items in the kitchen, including a dented frying pan, a broken television, and a broken wooden chair. Id. at 147-48 [305-06]. Trevor Morgan, a paramedic, estimated that Clopton had been on the kitchen floor "for quite a while" because "her hair was glued to the kitchen floor with [dried] blood." Id. at 156 [314]. Morgan saw that Clopton had a port on the back of her arm for her insulin pump and that the lines between the pump and the port were disconnected, and he determined that her blood sugar level was between 104 and 117—a number that could be considered normal for a Type I diabetic. Id. at 144-46 [302-04], 151-54 [309-12], 164-68 [322-26].[5]

Clopton was transported to the hospital by ambulance. Id. at 158 [316]. She had fractured bones in both hands, a subdural hematoma, and several bruises and lacerations. Id. at 124-32 [282-90]; Dkt. # 15-14, at 162-74 [584-96]; Dkt. # 16 (State's Exs. 4-6). An orthopedic surgeon surgically repaired an open fracture on Clopton's left hand and placed a cast on the closed fracture on her right hand on December 15, 2016. Dkt. # 15-13, 132 [290]. Four days later, after a clinical exam showed increasing pressure on Clopton's brain from the subdural hematoma, a neurosurgeon performed a burr hole and craniotomy. Dkt. # 15-14, at 172 [594]. Without the surgery to relieve the pressure caused by the subdural hematoma, Clopton could have sustained "relatively catastrophic neurological injury, potentially up to permanent vegetative state and/or death." Id. at

---

[5] Trevor Morgan testified that "everybody has a different normal" blood sugar level or range, that a Type I diabetic "has a certain range they're gonna want to stay in," and that he "would consider" between 104 and 117 "normal for a Type I." Dkt. # 15-13, at 167-68 [325-26].

174 [596], 177 [599].  Clopton survived the assault but had no recollection of it; she remembered

only waking up in the hospital, with both arms wrapped in casts, a bandage around her head, and

pain throughout her entire body.  Dkt. # 15-13, at 70-71 [492-93].

Although Clopton had no recollection of the assault, other evidence pointed to Morris as

her assailant:  partial DNA profiles obtained from a swab of a clear stain found on the kitchen floor

and from a swab of what was described as a possible bite mark on Clopton's shoulder were

consistent with Morris's DNA profile, Dkt. # 15-15, at 133-38 [826-31], 141 [834], 149-50 [842-

43], 158 [851], 279-80 [972-73], 290-92 [983-85], 294-98 [987-91]; GPS location data and phone

call logs revealed that the last outgoing call from Clopton's phone after she left the Mercury

Lounge was a call to Morris that ended at 12:45 a.m. on December 9, 2016, Id. at 172 [865], 182-

95 [875-888], 213-26 [906-19], 263 [956]; Clopton's next-door neighbor saw Morris standing on

Clopton's porch on the afternoon of December 9, between 4:30 and 5:00 p.m., and watched Morris

as he left in a dark car, then walked back to Clopton's house, and left a second time in Clopton's

car, Dkt. # 15-14, at 190-207 [612-29]; Clopton's car was later found abandoned on a street near

her house, Dkt. # 15-15, at 88-92 [781-85], 223-24 [916-17]; Morris told his sister that he gave his

credit card to Clopton before she went to her friend's birthday party, that he met up with Clopton

at the bar where she attended the party, that he argued with Clopton after she got home from the

party, and that he hit Clopton with a pan before he "blacked out," Dkt. # 15-15, at 75-80 [768-73];

McGee's mother saw Morris at McGee's house on December 8, for a Christmas party, and noticed

nothing unusual about his appearance, Id. at 38-43 [731-36]; James Gilbert, Jr., who knew Morris,

saw Morris at the Warehouse, a bar and grill, between 4:00 and 6:00 p.m. on December 9, saw that

Morris had a scratch on his forehead, and did not ask Morris about the scratch because Morris did

not "want to know about it," Dkt. # 15-15, at 305-08 [998-1001]; and Susie Atzbach, who knew

Morris, saw Morris at the Brook Alley Bar on the evening of December 9, noticed that he had a scratch on his cheek and a gash on his forehead, and took a selfie with Morris. Dkt. # 15-14, at 209-16 [631-38]; Dkt. # 16 (State's Ex. 150).

The State of Oklahoma ("the state") initially charged Morris with a total of eleven counts in four separate cases: Case Nos. CF-2016-4058, CF-2016-5614, CF-2016-6899, and CM-2016-5907. Dkt. # 14, at 20. On the state's unopposed motion, all eleven counts were joined and tried in Case No. CF-2016-6899. Id. at 20-21. Following a four-day trial in May 2018, a jury found Morris guilty of assault and battery with means or force likely to produce death (count one); domestic assault and battery resulting in great bodily harm (count two); domestic assault and battery with a dangerous weapon (count three); violation of a protection order (counts four, five, six, and ten); domestic assault and battery (second offense) (counts seven and nine); malicious injury to property (count eight); and interference with an emergency telephone call (count eleven). Dkt. # 15-19, Original Record ("O.R.") vol. 2, at 13-25.

At sentencing, the trial court dismissed the convictions of domestic assault and battery resulting in great bodily harm (count two) and domestic assault and battery with a dangerous weapon (count three), finding that these convictions merged with conviction of assault and battery with means or force likely to produce death (count one). Dkt. # 15-17, Tr. Sentencing, at 8. The trial court adopted the jury's sentencing recommendations and imposed the following terms: twenty-five years (count one), four years (count seven), four years (count nine), and one year each (counts four, five, six, eight, ten, and eleven). Id. at 8-9. The trial court ordered the terms for counts one, seven, nine, and four to be served consecutively to each other, and all remaining terms to be served concurrently, each with the other, and concurrently with the term for count four. Id. at 9.

## DISCUSSION

A federal court has discretion to issue a writ of habeas corpus to a state prisoner who demonstrates that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). But the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and federal habeas jurisprudence limit that discretion in several ways.[6] Relevant here, when a state court has adjudicated a federal claim on the merits, a federal court "shall not" grant habeas relief unless the prisoner first shows that the state court's adjudication of that claim either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1),[7] or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).[8] The

---

[6] The AEDPA imposes a one-year statute of limitations and requires a state prisoner to exhaust available state remedies before seeking federal habeas relief. 28 U.S.C. §§ 2244(d)(1), 2254(b)(1)(A). Respondent concedes that Morris timely filed the petition and that he exhausted available state remedies as to each of his claims. Dkt. # 14, at 3.

[7] The phrase "clearly established Federal law," as used in § 2254(d)(1), "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Bonney v. Wilson, 754 F.3d 872, 880 (10th Cir. 2014) (alteration in original) (citation and internal quotation marks omitted).

[8] Under § 2254(d)(2), "a factual finding may be unreasonable . . . only if the state court 'plainly misapprehended or misstated the record' and the 'misapprehension goes to a material factual issue that is central to the petitioner's claim.'" Frederick v. Quick, 79 F.4th 1090, 1104 (10th Cir. 2023) (quoting Menzies v. Powell, 52 F.4th 1178, 1195 (10th Cir. 2022)), cert. denied, 144 S. Ct. 2634 (2024). A federal court "may not characterize . . . state-court factual determinations as unreasonable 'merely because [the federal court] would have reached a different conclusion in the first instance.'" Brumfield v. Cain, 576 U.S. 305, 313-14 (2015) (alteration added) (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)). Further, and regardless of whether a federal court reviews a federal claim under § 2254(d)'s deferential standards or reviews that claim de novo, "state-court factfinding still receives the benefit of doubt under § 2254(e)(1): that is, '[a]ny state-court findings of fact that bear upon the claim are entitled to a presumption of correctness rebuttable only by "clear and convincing evidence."'" Fontenot v. Crow, 4 F.4th 982, 1061 (10th Cir. 2021) (quoting Hooks v. Workman, 689 F.3d 1148, 1164 (10th Cir. 2012)).

standard imposed by § 2254(d) is one of objective reasonableness, and the prisoner "carries the burden of proof" in satisfying this standard. Cullen v. Pinholster, 563 U.S. 170, 181 (2011). This burden is demanding; it requires the prisoner to "show[] there was no reasonable basis for the state court to deny relief." Harrington v. Richter, 562 U.S. 86, 98 (2011); see also Meek v. Martin, 74 F.4th 1223, 1248 (10th Cir. 2023) (noting that to satisfy § 2254(d) "[t]he prisoner must show that a state court's decision is 'so obviously wrong' that no reasonable judge could arrive at the same conclusion given the facts of the prisoner's case" (quoting Shinn v. Kayer, 592 U.S. 111, 118 (2020) (per curiam))). When § 2254(d) informs the federal court's analysis, "[d]eference is accorded to a state court result even when the state court fails to discuss any federal law rationale for its decision or cite to any federal authority." Webber v. Scott, 390 F.3d 1169, 1174 (10th Cir. 2004).

Moreover, even if a prisoner satisfies § 2254(d)'s preconditions to relief, a federal court need not grant habeas relief. See Brown v. Davenport, 596 U.S. 118, 134 (2022) ("While AEDPA announced certain new conditions to relief, it did not guarantee relief upon their satisfaction."); Horn v. Banks, 536 U.S. 266, 272 (2002) ("While it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review set forth in 28 U.S.C. § 2254(d) . . . none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard."). Rather, the prisoner "must still . . . persuade a federal habeas court that 'law and justice require' relief." Davenport, 596 U.S. at 134 (quoting 28 U.S.C. § 2243).

## I.   Claim one:  due process violation based on improper joinder

Morris claims his offenses were improperly joined for a single trial, resulting in a violation of his federal constitutional right to due process, because the offenses "were alleged to have taken

place in . . . three different time frames and two different locations," were unrelated, and were "not

part of the same series of criminal acts or transactions." Dkt. # 1, at 5. Because trial counsel did

not object to the joinder, the OCCA reviewed this claim for plain error, determined that Morris did

not "show actual or obvious error," and denied relief.[9] Dkt. # 14-4, at 4. The OCCA reasoned

that joinder was proper under state law because

> The charges in this case predominantly arose from three separate incidents of
> domestic violence occurring after [Morris] was served with the protective order
> obtained by the victim in early 2016. The charged crimes all occurred during the
> course of [Morris's] romantic relationship with the victim and demonstrated the
> volatile on-again, off-again nature of [Morris's] relationship. The State's proof
> showed the victim continued her relationship with [Morris] despite the protective
> order and [Morris's] recurring violence because she loved him. A logical
> relationship thus connected the repeated and ongoing instances of domestic abuse
> charged in this case that warranted joinder of these crimes for a single trial.

Id. at 4-5. The OCCA further reasoned that "the State's proof showed a pattern of offenses

committed against the same victim under similar circumstances." Id. at 5. The OCCA thus

concluded that Morris did not show plain error and did not "demonstrate that he was deprived of

a fair trial from joinder of the counts in this case." Id. at 6.

For two reasons, the Court denies the petition as to claim one. First, to the extent Morris

contends that joinder was improper under state law, the OCCA concluded otherwise, and, on

habeas review, this Court cannot second guess that conclusion. See Estelle v. McGuire, 502 U.S.

62, 67-68 (1991) (reiterating "that it is not the province of a federal habeas court to reexamine

state-court determinations on state-law questions"); Webber, 390 F.3d at 1177 n.5 ("To the extent

---

[9] On plain error review, the OCCA requires an appellant to "show an actual error, which is
plain or obvious, affected his substantial rights." Dkt. # 14-4, at 4. The OCCA "will only correct
plain error if the error seriously affected the fairness, integrity or public reputation of the judicial
proceedings or otherwise represents a miscarriage of justice." Id. The OCCA's plain error
standard is equivalent to the federal due process standard. Thornburg v. Mullin, 422 F.3d 1113,
1125 (10th Cir. 2005).

[the petitioner] is arguing that the joinder is improper under state law, such a claim is not a basis for federal habeas relief.").

Second, to the extent Morris contends that the OCCA unreasonably applied clearly established federal law when it determined that the joinder did not deprive him of due process, he does not develop any persuasive argument to support that contention. Improper joinder of multiple offenses in a single trial violates due process "only if it results in prejudice so great as to deny a defendant his . . . right to a fair trial." Lucero v. Kerby, 133 F.3d 1299, 1314 (10th Cir. 1998) (quoting United States v. Lane, 474 U.S. 438, 446 n.8 (1986)). The prejudice analysis requires courts to consider the circumstances of the case. For example, "prejudice may arise when there is a great disparity in the amount of evidence supporting the charges or when the jury is likely to confuse the evidence or infer a criminal disposition on the part of the defendant." Webber, 390 F.3d at 1178. Morris appears to argue, in part, that he suffered prejudice because "the less serious crime had stronger evidence and the more serious crime had weaker evidence." Dkt. # 1, at 11.[10] This argument is not persuasive because it appears to rest on Morris's contention, in claim four, that the evidence is insufficient to support his conviction of assault and battery with means or force likely to produce death. Dkt. # 1, at 11; Dkt. # 14-2, at 14-15. As further discussed below, Morris underestimates the strength of the evidence to support that conviction. See discussion infra section IV. Moreover, as respondent argues, the reasons given by the OCCA for concluding that joinder

---

[10] Morris makes this argument in claim six, where he alleges trial counsel was ineffective for failing to object to the joinder. Dkt. # 1, at 11. But he did make this argument to the OCCA to support his claim of prejudice from improper joinder. Dkt. # 14-2, at 14-15 (asserting "a great disparity in the amount of evidence for the July crimes and the December crimes" and further asserting that the state's evidence in support of the December assault and battery "rel[ied] entirely on the testimony of people who didn't see the abuse actually occur" because Clopton could not identify who injured her). Applying the rule of liberal construction, the Court finds it appropriate to consider this argument as also made in support of claim one.

was proper under state law, see Dkt. # 14-4, at 4-5, strongly suggest that state law likely would have permitted the admission of evidence of Morris's other crimes even if his eleven offenses had not been joined for a single trial.  Dkt. # 14, at 25-26; see, e.g., Gilson v. State, 8 P.3d 883, 905 (Okla. Crim. App. 2000) ("Evidence of the other offenses would have been permissible pursuant to 12 O.S. 1991, § 2404(B) to prove identity, common scheme or plan, and absence of mistake or accident.  Accordingly, we cannot find that the joinder of offenses severely prejudiced [the appellant's] right to a fair trial.").  Further, the Court notes that the trial instructed the jury to "give separate consideration for each offense," and that "[t]he fact that you return a verdict of guilty or not guilty on one offense should not, in any way affect your verdict regarding any one of the other offenses."  Dkt. # 15-19, O.R. vol. 2, at 69.

It was objectively reasonable for the OCCA to conclude that the joinder of offenses in this case did not deprive Morris of his federal constitutional right to due process.  The Court thus finds that § 2254(d) bars relief and denies the petition as to claim one.

## II.    Claim two:  due process violation based on insufficient evidence

Next, Morris challenges the sufficiency of the evidence to support his conviction, in count eleven, of interference with an emergency telephone call.  Dkt. # 1, at 7.  Morris alleges that "[t]here was no evidence that [he] interfered with an emergency call," and that "[t]here was no testimony that this event ever happened."  Id.

The Fourteenth Amendment's due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  When reviewing the sufficiency of the evidence supporting a criminal conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

Applying Jackson, the OCCA found the evidence sufficient "to allow any rational trier of fact to find beyond a reasonable doubt the essential elements of the crime of Interference with Emergency Telephone Call." Dkt. # 14-4, at 6. Viewing the evidence presented at trial in the light most favorable to the state, the OCCA reasoned that

> the jury could reasonably infer from this evidence the victim wanted to place a 911 call for assistance in getting [Morris] to leave and that [Morris] intentionally prevented or hindered the victim from doing so by keeping, then smashing, her cellphone after she hit the panic button on her alarm system. Sufficient evidence was presented to support Count 11.

Id.

Because the OCCA applied Jackson, the only question for this Court is whether the OCCA applied it in an objectively unreasonable manner. Hooks, 689 F.3d at 1167. To answer this question, the Court first looks to state law to determine the essential elements of the crime. Hawes v. Pacheco, 7 F.4th 1252, 1264 (10th Cir. 2021). The Court then "examine[s] whether the evidence suffices to establish each element." Anderson-Bey v. Zavaras, 641 F.3d 445, 448 (10th Cir. 2011). But "Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman v. Johnson, 566 U.S. 650, 651 (2012). The first layer requires the reviewing court, here the OCCA, to defer to the jury's decision as to "what conclusion should be drawn from evidence admitted at trial," unless "no rational trier of fact could have agreed with the jury." Id. (quoting Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam)). The second layer requires this Court to defer to the OCCA's decision unless that decision is objectively unreasonable. Id.

Morris has not shown that the OCCA's decision is objectively unreasonable. To obtain a conviction on count eleven, the state had to prove, beyond a reasonable doubt, that (1) Morris (2)

intentionally (3) interrupted, disrupted, impeded, or prevented, (3) an emergency phone call. OKLA. STAT. tit. 21, § 1211.1; Dkt. # 15-19, O.R. vol. 2, at 63 (Instruction No. 33). Clopton testified that Morris took her phone from her after she refused to let him see it; refused to leave her home even after she threatened to set off her panic alarm and she twice followed through on that threat; threw her phone against the wall and shattered it after she engaged the panic alarm the second time; and smashed the panic alarm. Dkt. # 15-14, Tr. Trial vol. 3, at 36-41 [458-63]. As the OCCA reasoned, viewing this evidence in the state's favor, any rational juror could have found the essential elements of the crime charged in count eleven beyond a reasonable doubt. Section 2254(d) therefore bars relief, and the Court denies the petition as to claim two.

### III.    Claim three:  due process violation based on denial of motion for mistrial

Morris claims "[t]here was manifest necessity to grant a mistrial after a witness mentioned a rape kit and the trial court abused its discretion by denying a mistrial." Dkt. # 1, at 8. When the prosecutor asked the state's first witness, Clopton's father, whether he was "ever present with" Clopton at the hospital, he responded, "Yes.  While they - - we got there about the time they were doing the rape kit and we couldn't go - -." Dkt. # 15-13, Tr. Trial vol. 2, at 108 [266]. Morris's attorney immediately objected, and the trial court sustained the objection, admonished the jury to disregard that last statement, called a bench conference, and strongly questioned the prosecutor's failure to advise her witness not to mention evidence that was excluded by a pretrial ruling. Id. at 109-10 [267-68]. The trial court, however, overruled defense counsel's oral motion for mistrial. Id. Morris alleges that the trial court should have granted the mistrial because he "was prejudiced by the prosecution witness comment of an uncharged crime" given that "[a]n allegation of rape is likely to cause an emotional reaction in jurors, and the simple admonishment to disregard is unlikely to help." Dkt. # 1, at 8.

The OCCA considered whether the trial court abused its discretion in denying the motion for mistrial and found no abuse of discretion. The OCCA stated that "[a] mistrial is an appropriate remedy when an event at trial results in a miscarriage of justice or constitutes an irreparable and substantial violation of an accused's constitutional or statutory right." Dkt. # 14-4, at 7. The OCCA reasoned:

> The trial court did not abuse its discretion in denying [Morris's] motion for mistrial based on the witness's reference to a rape kit being used at the hospital. The trial court's swift and decisive intervention sustaining the defense objection and admonishing the jury to disregard the witness's challenged testimony cured the error. Jurors are presumed to follow their instructions. Blueford v. Arkansas, 566 U.S. 599, 606 (2012). "The incident in the present case was of short duration and the trial court took appropriate measures to reduce the risk of unfair prejudice." Tryon v. State, 2018 OK CR 20, ¶ 134, 423 P.3d 617, 653. It is notable the witness's testimony made only passing mention of the rape kit being used at the hospital and gave no further details. The prejudicial effect of this testimony too was blunted somewhat by its timing, occurring with the first witness in a twenty-seven witness trial. Under the total circumstances, there was no abuse of discretion from the trial court's handling of this matter.

Id. at 7-8.

Morris does not appear to argue that the OCCA's decision is based on an unreasonable determination of the facts. Nor could he prevail on that argument if he made it. See Dkt. # 15-13, Tr. Trial vol. 2, at 108-10 [266-68]. Morris instead appears to argue that the OCCA's decision is based on an unreasonable application of clearly established federal law because, in Morris's view, the bare mention of the phrase "rape kit" was sufficiently prejudicial to deny him a fair trial. That argument too is unavailing. Under clearly established federal law, "trial judges may declare a mistrial 'whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity' for doing so." Renico v. Lett, 559 U.S. 766, 773-74 (2010) (quoting United States v. Perez, 22 U.S. 579, 580 (1824)). "The decision to declare a mistrial is left to the 'sound discretion' of the judge, but 'the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes.'" Id. (quoting Perez, 22 U.S. at 580). On

13

habeas review, however, the question for the federal court

> is not whether the trial judge should have declared a mistrial.  It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review.  The question under AEDPA is instead whether the determination of the [state court] that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law."

Id. at 772-73 (quoting 28 U.S.C. § 2254(d)(1)).  Contrary to Morris's position, it was objectively reasonable for the OCCA to conclude that the trial court did not abuse its discretion.  As the OCCA reasoned, the isolated rape-kit statement made by the first of twenty-plus witnesses on the first day of a four-day trial—a statement that the jury was immediately admonished to disregard—did not give rise to the manifest necessity that would support declaring a mistrial.  As a result, § 2254(d) bars relief, and the Court denies the petition as to claim three.

## IV.    Claim four:  due process violation based on insufficient evidence

Morris next challenges the sufficiency of the evidence to support his conviction, in count one, of assault and battery with means or force likely to produce death.  Dkt. # 1, at 10.  Morris argues that the evidence was insufficient "[b]ecause [Clopton] could not . . . have laid for thirty-three (33) hours without her blood sugar falling."  Id.  He further alleges that "[t]here is a lack of evidence in the case upon which a rational trier of fact could say that [he] attacked" Clopton because "[s]he could not have been attacked on December 8th, and [he] had witnesses testifying to his whereabouts all of the evening of December 9, 2016."  Id.  On direct appeal, Morris made this same argument and identified those witnesses as James Gilbert and Susie Atzbach.  Dkt. # 14-2, at 21-22.

As previously discussed, Jackson provides the clearly established federal law for a challenge to the sufficiency of the evidence and requires the reviewing court to consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson, 443

U.S. at 319.  Applying <u>Jackson</u> and viewing the evidence in the light most favorable to the state, the OCCA concluded that "sufficient evidence was presented at trial to allow any rational trier of fact to find beyond a reasonable doubt the essential elements of the crime of Assault and Battery with Means of Force Likely to Produce Death."  Dkt. # 14-4, at 8.  The OCCA reasoned:

> The State presented evidence showing [Morris] went to the victim's home around 12:45 a.m. on December 9, 2016, for a prearranged visit, then was seen leaving the victim's home the next day around 4:30 or 5:00 p.m. after a neighbor heard loud noises and yelling.  [Morris] was seen later that day with injuries to his face, including a gash to his forehead and a scratch on his cheek.  The victim had no cell phone activity after her last call with [Morris] at 12:45 a.m. on December 9th.  The [s]tate presented DNA evidence connecting [Morris] both to the victim's bite mark and the crime scene.  Further, the [s]tate presented evidence that [Morris] admitted attacking the victim with a skillet during an argument.  A dented skillet with a missing handle, covered in the victim's blood, was found in the kitchen near the victim's body.  This evidence was more than sufficient to support [Morris's] conviction on Count 1.

<u>Id.</u> at 8-9.

Morris is correct that two witnesses testified they saw him on the evening of December 9, 2016.  Gilbert testified that he saw Morris at a bar and grill between 4:00 and 6:00 p.m.  Dkt. # 15-15, Tr. Trial vol. 4, at 306-07 [999-1000].  Gilbert also testified he observed a scratch on Morris's forehead.  <u>Id.</u>  Atzbach testified she saw Morris at a bar when she arrived at some unspecified time; that they sat together and talked; that she noticed that he had a scratch on his cheek and a gash on his forehead; that he explained to her that he fell out of an Uber "a couple nights before" and hit his forehead on the car door and that he burned his cheek with a cookie sheet while making Christmas cookies with friends; that she left the bar between midnight and 12:30 a.m. on December 10; that she declined Morris's request for a ride to the airport where he said he needed to get money for his bar tab; that Morris followed her home from the bar, driving a black SUV; and that Morris stayed at her house for an unspecified amount of time before leaving on December 10.  Dkt. # 15-14, Tr. Trial vol. 3, at 209-18 [631-40].

15

Considering the trial record, it is not clear why Morris views the testimony from Gilbert and Atzbach as favorable to his defense given that both testified that he had facial injuries on December 9 and other witnesses testified that he had none on December 8.  Regardless, even accepting Morris's assessment of the Gilbert and Atzbach testimony, Morris essentially asks this Court to view these bits of evidence in his favor and find that the state's evidence is therefore lacking.  That is not how the Jackson standard works.  Rather, the OCCA correctly applied that standard by viewing all evidence—direct evidence, circumstantial evidence, and reasonable inferences that could be drawn therefrom by the jury—in the light most favorable to the state and determining that any rational juror could find Morris's guilt beyond a reasonable doubt.

And, on the record presented, Morris has not shown that the OCCA unreasonably applied Jackson when it reached that conclusion.  To obtain a conviction on count one, the state had to prove, beyond a reasonable doubt, that Morris committed (1) an assault and battery (2) upon another person (3) with means of force likely to produce death.  OKLA. STAT. tit. 21, § 652(C); Dkt. # 15-19, O.R. vol. 2, at 42 (Jury Instruction No. 12).  The jury was instructed that "[a]n assault is any willful and unlawful attempt to offer to do a bodily hurt to another with force or violence," that "[b]attery is any willful and unlawful use of force or violence upon the person of another," that willful means purposeful, and that "[a]ny touching of a person regardless of how slight may be sufficient to constitute force."  Id. at 43-44, 47 (Jury Instruction Nos. 13, 14, 17).  As previously discussed, and as found by the OCCA, the state presented compelling circumstantial evidence supporting that Morris committed the December 2016 assault and battery of Clopton.  Dkt. # 14-4, at 8-9; see supra pp. 4-5.  Because the OCCA applied Jackson in an objectively reasonable manner, § 2254(d) bars relief and the Court denies the petition as to claim four.

16

## V.    Claim five:  due process violation based on constructive amendment to count one

Morris claims his due process rights "were violated when the [s]tate changed the alleged crime from assault and battery with intent to kill to assault and battery with means or force likely to produce death."  Dkt. # 1, at 11.  He alleges that he "was not afforded notice and fair opportunity to defend against the allegation for which he was convicted because the State amended the charge after" the close of all evidence.  Dkt. # 48, at 5; <u>see also</u> <u>id</u>. at 9 (asserting that "the State violates due process under the Fourteenth Amendment when it is allowed to charge, arraign, preliminarily examine, bind over, and try a criminal defendant under one set of listed elements and . . . to change the substance of the charge to gain an ill-begotten conviction").

### A.    State law, additional facts, and OCCA decision

Morris's count one conviction is based on an Oklahoma law that prohibits five crimes, Okla. Stat. tit. 21, § 652.  <u>Goree v. State</u>, 163 P.3d 583, 584 n.5 (Okla. Crim. App. 2007).  That statute provides:

> A. Every person who intentionally and wrongfully shoots another with or discharges any kind of firearm, with intent to kill any person, including an unborn child as defined in Section 1-730 of Title 63 of the Oklahoma Statutes, shall upon conviction be guilty of a felony punishable by imprisonment in the State Penitentiary not exceeding life.
>
> B. Every person who uses any vehicle to facilitate the intentional discharge of any kind of firearm, crossbow or other weapon in conscious disregard for the safety of any other person or persons, including an unborn child as defined in Section 1-730 of Title 63 of the Oklahoma Statutes, shall upon conviction be guilty of a felony punishable by imprisonment in the custody of the Department of Corrections for a term not less than two (2) years nor exceeding life.
>
> C. Any person who commits any assault and battery upon another, including an unborn child as defined in Section 1-730 of Title 63 of the Oklahoma Statutes, by means of any deadly weapon, or by such other means or force as is likely to produce death, or in any manner attempts to kill another, including an unborn child as defined in Section 1-730 of Title 63 of the Oklahoma Statutes, or in resisting the execution of any legal process, shall upon conviction be guilty of a felony punishable by imprisonment in the State Penitentiary not exceeding life.

D. The provisions of this section shall not apply to:

1. Acts which cause the death of an unborn child if those acts were committed during a legal abortion to which the pregnant woman consented; or

2. Acts which are committed pursuant to usual and customary standards of medical practice during diagnostic testing or therapeutic treatment.

E. Under no circumstances shall the mother of the unborn child be prosecuted for causing the death of the unborn child unless the mother has committed a crime that caused the death of the unborn child.

OKLA. STAT. tit. 21, § 652.  The OCCA has explained that "[a]ssault and battery with a deadly weapon, as set forth in this statute, does not explicitly require an intent to injure or kill if the weapon or force used is likely to produce death."  Burleson v. Saffle, 46 P.3d 150, 153 (Okla. Crim. App. 2002).  In Goree, the OCCA directly considered a claim, asserted by a defendant convicted of assault and battery with a deadly weapon, under § 652(C), that "the trial court erred in allowing the [s]tate to amend the Information and modify the jury instructions, deleting the element of intent to take a human life."  163 P.3d at 583-84.  The OCCA noted that, "[r]ead as a whole, § 652 separately prohibits five crimes (shooting with intent to kill, use of a vehicle to facilitate the intentional discharge of a weapon, assault and battery with a deadly weapon or by any means likely to produce death, attempts to kill, and use of a deadly weapon in resisting legal process)."  Goree, 163 P.3d at 584 n.5.  The OCCA further noted that § 652(C) prohibits three crimes:  (1) "any assault and battery upon another, by means of any deadly weapon, or by such other means or force as is likely to produce death"; (2) "attempts to kill"; and (3) "use of a deadly weapon in resisting legal process."  Id.  The OCCA concluded that § 652(A) "clearly and explicitly requires intent to kill" and that "[n]either §§ 652(B) nor 652(C) now have that explicit requirement."  Id. at 584.  The OCCA further stated that

[t]he Legislature could easily have included an intent requirement in § 652(C) as well.  It did not, instead referring to an assault and battery "using a deadly weapon" or "by any means likely to produce death." Neither of these phrases, on their face,

18

require the State to prove that the defendant intended to kill his victim.

Id. at 584.

As to count one, the state charged Morris, in the original felony information and in two amended felony informations, as follows:

**(Count 1)**
**21 O.S. 652(C)**

**BRENT ALLEN MORRIS**, between **12/8/2016** and **12/10/2016**, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the crime of **ASSAULT AND BATTERY WITH INTENT TO KILL**, a Felony, by unlawfully, feloniously, willfully, and intentionally, without justifiable or excusable cause, commit an assault and battery upon one Charis Brianne Clopton with a weapon, to wit:  a frying pan held in the hand of said defendant and with which he did then and there repeatedly strike the said Charis Brianne Clopton in the head causing life threatening injuries, to wit:  subdural hematoma

Dkt. # 15-18, O.R. vol. 1, at 31, 77, 196 (capitalization and boldface type in original).

Morris was bound over for the crime of assault and battery with intent to kill after preliminary hearing, the charge in count one was presented to the jury in opening statements as a charge of assault and battery with intent to kill, and on the final day of trial, after the close of all evidence and during the jury instructions conference, the state requested a jury instruction on the elements of assault and battery by means or force likely to produce death.  Dkt. # 14, at 48; Dkt. # 48, at 1-14.  After hearing arguments from the prosecutor and defense counsel, the trial court ruled,

over defense counsel's objection,[11] that it would change the statement of the case to reflect the

charge of assault and battery by means or force likely to produce death and give the pattern jury

instruction for that same crime.  Dkt. # 15-16, Tr. Trial vol. 5, at 6-15 [1020-29].   Highly

summarized, the trial court reasoned that the state mistakenly described the crime charged as

assault and battery with intent to kill when it charged Morris with a violation of § 652(C); that the

factual allegations in the information were consistent with charging assault and battery by means

or force likely to produce death, in violation of § 652(C); and that, pursuant to Goree, the state is

not required to prove intent to kill to support a charge of assault and battery by means or force

likely to produce death under § 652(C).  Id.  Consistent with the trial court's ruling, the jury was

instructed that, to obtain a conviction as to count one, the state was required to prove, beyond a

reasonable doubt, that Morris committed (1) an assault and battery (2) upon another person (3)

with means of force likely to produce death.  OKLA. STAT. tit. 21, § 652(C); Dkt. # 15-19, O.R.

vol. 2, at 42 (Jury Instruction No. 12).

On direct appeal, Morris claimed that his due process rights were violated when the state

"changed the alleged crime from assault and battery with intent to kill to assault and battery with

means or force likely to produce death."  Dkt. # 14-2, at 23.  He identified two harms arising from

---

[11] Defense counsel's objection appeared to focus on the proposed jury instruction.  Counsel stated that, as charged and initially described to the jury Morris was accused of assault and battery with intent to kill, and that the state's proposed revised instruction tells the jury that he is charged with assault and battery with intent to kill "but then take[s] out the element that they have to prove that he intended to kill.  Dkt. # 15-16, Tr. Trial vol. 5, at 7-8, 12-14.  The state argued that the proposed instruction, based on Oklahoma Uniform Jury Instruction 4-7, lists the elements for a violation of § 652(C) based on an assault and battery by means of force likely to produce death, and thus was the appropriate instruction.  Id. at 8.  The trial court then asked the state to explain why the information identified the crime as assault and battery with intent to kill.  Id. at 8-9.  The trial court found that the state mislabeled the crime in the charging document but appropriately alleged, by citation to § 652(C) and the underlying facts, the crime of assault and battery by means of force likely to produce death.  Id. at 9-11.

the trial court's decision to permit the state to allegedly change the charge in count one. He argued (1) that the charging document was so defective that it failed to confer jurisdiction on the trial court and (2) that a due process violation occurred because he was prepared to defend against one charge and was "suddenly" required to defend against another. Dkt. # 14-2, at 23-26. In support of the second argument, Morris alleged "he did not know what to defend against" because he "was put on notice that the [s]tate needed to prove an intent element" and argued that it was "fundamentally unfair to permit the state to "drop an element that the [s]tate has to prove after the defense has rested." Id. at 26.

Relevant to the due process argument based on a lack of notice,[12] the OCCA stated,

> At the instruction conference, the trial court correctly observed the Count 1 charge was mislabeled in the amended Information as Assault and Battery with Intent to Kill. Title 21 O.S. 2011, § 652(C), the subsection cited as authority for the charge, did not authorize prosecution for this crime. Despite the State's charging error, the trial court allowed the State to proceed on Count 1 with the crime of Assault and Battery With Means of Force Likely to Produce Death. The trial court very reasonably found the supporting facts pled in support of the Count 1 charge were generally consistent with this charge as it was the explicit statutory reference for Count 1 found in the amended Information. Further, the supporting facts pled in Count 1 alleged neither an intent to kill nor an attempt. The trial court correctly viewed the problem with Count 1 as a simple labeling error that was not fatal to the charge "because it is clear from the allegations of fact what crime is being charged." Saulmon v. State, 1980 OK CR 58, ¶ 6, 614 P.2d 83, 85.

> . . .

> [Morris's] claim that his due process rights were violated because he did not have notice of the charge against him also lacks merit. "An accused is entitled to notice of the charge he must be prepared to defend against." Patterson v. State, 2002 OK CR 18, ¶ 23, 45 P.3d 925, 931. As discussed above, Appellant was charged, convicted and sentenced under Section 652(C) and he was fully apprised of the charge he faced based on the factual assertions pled in the charge. Defense counsel did not complain below about a lack of notice concerning the charge against which she had to defend. The record also does not show defense counsel was

---

[12] The Court has carefully reviewed the petition and the reply and understands claim five as asserting only the due process argument that Morris presented to the OCCA. Dkt. # 1, at 11; Dkt. # 48, at 1-13.

hampered in any way from presenting [Morris's] defense due to the [s]tate's charging error. Because [Morris] was adequately apprised of the charges against him based on the "four corners" of the amended Information together with the materials provided to him at preliminary hearing and through discovery, his due process challenge must be denied. Parker, 1996 OK CR 19, ¶ 24, 917 P.2d at 986.

Dkt. # 14-4, at 10-11.

### B.    Analysis and conclusion

As previously noted, this Court understands claim five as asserting the same due process claim that he raised on direct appeal. See supra n.12. Respondent understands "the gravamen of this due process claim []as a challenge to the sufficiency of the notice for the crime that was given before trial" and as alleging that the charging document was insufficient to provide notice of the charge against him. Dkt. # 14 at 47. The Court disagrees. As the Court understands it, Morris alleges a due process violation occurred, not because the charging document was insufficient to identify a crime, but because the charging document identified a different crime than the one that was submitted to the jury. Dkt. # 1, at 11; Dkt. # 48, at 1-13. It appears that this is how the OCCA understood his due process claim as well. See Dkt. # 14-4, at 10-11 (citing Patterson, 45 P.3d at 931, wherein the OCCA addressed "[a] variance between the charge made in the Information, and the evidence or theory presented at trial" and cited federal law for the proposition that a variance "is not fatal to the conviction unless it either deprived the defendant of adequate notice of what he had to defend against, or subjects him to double jeopardy").

With that clarification, the clearly established federal law governing claim five is the law addressing variances and constructive amendments. "[I]t is a fundamental precept of federal constitutional law that a 'court cannot permit a defendant to be tried on charges that are not made in the indictment.'" Hunter v. New Mexico, 916 F.2d 595, 598 (10th Cir. 1990) (quoting Stirone v. United States, 361 U.S. 212, 217 (1960)). Under the Sixth and Fourteenth Amendments, a defendant "has the right to be informed of the nature and cause of the accusations filed against

him."  Id.    Relevant here, a charging document "is constructively amended if the evidence presented at trial, together with the jury instructions, raises the possibility that the defendant was convicted of an offense other than that charged in the [information]."  Id. at 599 (alteration added) (internal quotation marks omitted) (quoting United States v. Apodaca, 843 F.2d 421, 428 (10th Cir. 1988)).  To constitute a constructive amendment, "the change in the [information] must be more than the addition or deletion of nonessential factual averments.  Rather, the amendment must effectively alter the substance of the [information]."  Id. (alterations added).  But federal habeas relief is available only if the petitioner establishes prejudice arising from the variance between the trial evidence and the facts alleged in the information.  Id.  "Thus, even if a defendant is convicted on charges differing from those in the [i]nformation, no due process violation exists if the defendant was aware of the facts underlying the charges."  Shouse v. Jones, No. CIV-06-1012-F, 2007 WL 464701, at *7 (W.D. Okla. Feb. 8, 2007) (unpublished).[13]

The Court finds that the OCCA applied these legal principles in an objectively reasonable manner when it determined that Morris suffered no prejudice, and thus no due process violation. As the OCCA stated, the "problem with Count 1 [w]as a simple labeling error that was not fatal to the charge because it is clear from the allegations of fact what crime is being charged."  Dkt. # 14-4, at 10-11.  The OCCA further reasoned that Morris suffered no prejudice because:

> [Morris] was charged, convicted and sentenced under Section 652(C) and he was fully apprised of the charge he faced based on the factual assertions pled in the charge.  Defense counsel did not complain below about a lack of notice concerning the charge against which she had to defend.  The record also does not show defense counsel was hampered in any way from presenting [Morris's] defense due to the [s]tate's charging error.  Because [Morris] was adequately apprised of the charges against him based on the "four corners" of the amended Information together with the materials provided to him at preliminary hearing and through discovery, his due

---

[13] The Court cites this unpublished decision for its persuasive value.  See Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

process challenge must be denied.  Parker, 1996 OK CR 19, ¶ 24, 917 P.2d at 986.

Id.  Morris has shown that he disagrees with the OCCA's conclusion that no due process violation

occurred, but he has not shown that fairminded jurists would disagree with that conclusion.  For

that reason, § 2254(d) bars relief and the Court denies the petition as to claim five.

## VI.    Claim six:  denial of constitutional right to counsel at trial

Morris claims trial counsel provided constitutionally deficient representation by failing to

(1) to object to the joinder of his offenses, (2) demur to count eleven, and (3) argue that the charges

in counts one, two, and three violated a state statute prohibiting multiple punishments for the same

"criminal act or omission."[14]  Dkt. # 11, at 1; see also Dkt. 14-2, at 27-32.

Claims of ineffective assistance of counsel are analyzed under the two-pronged test

established in Strickland v. Washington, 466 U.S. 668 (1984).  A defendant must establish both

deficient performance and resulting prejudice.  Id. at 687-88.  To establish deficient performance,

the defendant must show "that counsel's representation fell below an objective standard of

reasonableness."  Id.  To establish prejudice, a defendant must show a "reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different."

Id. at 694.  When, however, a petitioner seeks habeas relief on a claim of ineffective assistance of

counsel under § 2254(d), "the question is not whether counsel's actions were reasonable.  The

question is whether there is any reasonable argument that counsel satisfied Strickland's deferential

standard."  Richter, 562 U.S. at 105.

Applying Strickland, the OCCA concluded that Morris did not show deficient performance

or resulting prejudice, reasoning:

We rejected [Morris's] challenge to the joinder of counts in Proposition I and his

---

[14] See OKLA. STAT. tit. 21, § 11, which provides, in relevant part, that "in no case can a criminal act or omission be punished under more than one section of the law."

challenge to the sufficiency of the evidence supporting his Count 11 conviction for
Interference with Emergency Telephone Call.  Further, the trial court dismissed
[Morris's] convictions on Count 2:  Domestic Assault and Battery Resulting in
Great Bodily Harm and Count 3:  Domestic Assault and Battery With a Dangerous
Weapon at formal sentencing on grounds of merger with the Count 1 conviction.
Defense counsel thus was not ineffective for failing to raise these claims.  Logan v.
State, 2013 OK CR 2, ¶ 11, 293 P.3d 969, 975.

Dkt. # 14-4, at 11-12.

Morris reasserts the same Strickland claim he presented to the OCCA,[15] but he does not

argue that the OCCA unreasonably applied Strickland.  Dkt. # 1, at 11.  Regardless, having

carefully reviewed the trial record, the Court finds that the OCCA's adjudication of this claim does

not involve an unreasonable application of Strickland to the facts of this case and is not based on

an unreasonable determination of the facts.  As discussed in claims one and two, the OCCA

determined that joinder of Morris's offenses was proper under state law and reasonably concluded

that the joinder did not violate his right to due process, and the OCCA reasonably determined that

the evidence was sufficient to support his count eleven conviction.  Because the OCCA found

these claims were meritless, it was objectively reasonable for the OCCA to conclude that trial

counsel was not ineffective for failing to object to the joinder and challenge the sufficiency of

evidence to support count eleven.  See, e.g., Williams v. Trammell, 782 F.3d 1184, 1202-06 (10th

Cir. 2015) (finding the OCCA reasonably applied Strickland to find no deficient performance in

the trial attorney's failure to lodge meritless objections).  Further, as respondent contends, trial

---

[15] In his reply, Morris raises a new allegation of ineffectiveness by arguing that the
allegedly prejudicial constructive amendment of the charge in count one, see discussion supra
section V, rendered trial counsel's performance deficient and prejudicial because counsel was not
prepared to defend "against each and every element within that divisible statute," presumably, §
652. Dkt. # 48, at 13-16.  Because this allegation was not presented to the OCCA, it is unexhausted,
and the Court declines to review it for that reason.  28 U.S.C. § 2254(b)(1)(A); Ellis v. Raemisch,
872 F.3d 1064, 1076 (10th Cir. 2017) ("AEDPA prohibits federal courts from granting habeas
relief to state prisoners who have not exhausted available state remedies.").

counsel effectively raised a § 11 argument by requesting a merger of counts one, two, and three at the preliminary hearing stage. Dkt. # 14, at 64. And, as the OCCA found, the trial court dismissed Morris's convictions as to counts two and three at the sentencing stage because they merged with his count one conviction. Thus, it was objectively reasonable for the OCCA to conclude that trial counsel did not perform deficiently, and that Morris suffered no resulting prejudice, from the alleged failure to argue a § 11 violation. For these reasons, § 2254(d) bars relief and the Court denies the petition as to claim six.

## VII.    Claim seven:  due process violation based on cumulative error

Morris claims the "accumulation of error in this case deprived [him] of due process of law under the Fifth and Fourteenth Amendments because each error worked with the others to deprive [him] of a fair trial." Dkt. # 1, at 11.

"[W]hen a habeas petitioner raises a cumulative error argument under due process principles the argument is reviewable because 'Supreme Court authority clearly establishes the right to a fair trial and due process.'" Hanson v. Sherrod, 797 F.3d 810, 852 n. 16 (10th Cir. 2015) (quoting Darks v. Mullin, 327 F.3d 1001, 1017 (10th Cir. 2003)). "A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Smith v. Duckworth, 824 F.3d 1233, 1255 (10th Cir. 2016) (quoting Cargle v. Mullin, 317 F.3d 1196, 1206 (10th Cir. 2003)). This "analysis applies where there are two or more actual errors. It does not apply, however, to the cumulative effect of non-errors." United States v. Franklin-El, 555 F.3d 1115, 1128 (10th Cir. 2009). "In the federal habeas context, the only otherwise harmless errors that can be aggregated are federal constitutional errors, and such errors will suffice to permit relief under cumulative error doctrine 'only when the constitutional errors committed in the state

court trial so fatally infected the trial that they violated the trial's fundamental fairness.'" Matthews v. Workman, 577 F.3d 1175, 1195 n.10 (10th Cir. 2009) (citation omitted).

The OCCA denied Morris's cumulative-error claim, finding that he "has not proven the existence of two or more errors in this appeal that we can cumulate" and that "[r]eview of the record shows this is simply not a case where numerous irregularities during [his] trial tended to prejudice his rights or otherwise deny him a fair trial." Dkt. # 14-4, at 12.  Because there were no federal constitutional errors for the OCCA to aggregate, Morris has not shown that the OCCA unreasonably applied the due process standard when it adjudicated his cumulative error claim.  As a result, § 2254(d) bars relief, and the Court denies the petition as to claim seven.

## VIII.    Claims eight through eleven:  denial of constitutional right to counsel on direct appeal

Morris's last four claims allege that appellate counsel provided constitutionally deficient representation by failing to raise certain issues on direct appeal.  Dkt. # 1, at 12-13.  He specifically contends that appellate counsel should have argued:  (1) that the state lacked subject-matter jurisdiction to prosecute him for crimes he committed in Indian country (claim eight); (2) that the state's "overcharging" of offenses resulted in a double jeopardy violation (claim nine); (3) that trial counsel was ineffective for failing to investigate and consult with an expert witness about Clopton's use of an insulin pump (claim ten); and (4) that the prosecutor committed misconduct by "withholding the raw data generated from a DNA test" and thus precluding Morris from having an expert witness examine that test (claim eleven).  Id.

Strickland's two-part inquiry applies to claims alleging ineffective assistance of appellate counsel based on the failure to raise issues on appeal.  Smith v. Robbins, 528 U.S. 259, 285-89 (2000).  In this context, the inquiry focuses on whether the appellant has shown "that a particular nonfrivolous issue" appellate counsel omitted from the appeal "was clearly stronger than issues

that counsel did present." Id. at 288.  An "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." Id. (citing Jones v. Barnes, 463 U.S. 745 (1983)). And, even if an appellant establishes that appellate counsel performed deficiently, the appellant must show resulting prejudice, i.e., "a reasonable probability that," but for appellate counsel's deficient performance, the appellant "would have prevailed on his appeal." Robbins, 528 U.S. at 285-86.  "When . . . the basis for the ineffective assistance claim is the failure to raise an issue, [the reviewing court] must look to the merits of the omitted issue." United States v. Orange, 447 F.3d 792, 797 (10th Cir. 2006).  "If the omitted issue is without merit, then counsel's failure to raise it is not prejudicial, and thus is not ineffective assistance." Id.

Applying Strickland and considering the merits of each claim Morris faulted appellate counsel for not raising, the OCCA denied relief.  First, the OCCA noted that Morris "ma[de] no claim that he is Indian." Dkt. # 14-13, at 2.  The OCCA understood Morris's claim as asserting that "the fact that his crimes were committed on land belonging to the Creek and/or Cherokee Nations is sufficient alone to divest the State of jurisdiction" on the ground that "jurisdiction was preempted by the Oklahoma Enabling Act." Id. at 2-3.  The OCCA found that claim without merit, reasoning:

> Petitioner's claim, if true, would be a radical departure from the rulings of this Court and that of the United States Supreme Court.  As far back as United States v. McBratney, 104 U.S. 621 (1882), the law has been that a non-Indian charged with committing crimes against other non-Indians in Indian Country is subject to prosecution under state law.  See id. at 623-24; Parker v. State, 2021 OK CR 17, ¶ 35, 495 P.3d 653, 665 ("A defendant's Indian status or that of a crime victim is an essential element of an MCA offense and must be proved by the prosecution in order to have federal jurisdiction over crimes committed by or against Indians in Indian Country"); State v. Klindt, 1989 OK CR 75, ¶ 5, 644 P.2d 114, 116 ("fundamental to the appellant's claim that state jurisdiction was preempted by federal statute is a determination of whether appellant is an Indian").

> These cases, at least implicitly, rejected the notion that statutes or treaties

> purporting to divest states of criminal jurisdiction survived admission into the union.  That is, unless the state's enabling act proclaimed otherwise "by express words."  McBratney, 104 U.S. at 623-24.  As the United States Supreme Court recently observed, "[t]he Oklahoma Enabling Act contains no such express exception."  Oklahoma v. Castro-Huerta, 142 S. Ct. 2486, 2504 (2022).
>
> Petitioner's attempt to conjure up exclusive federal jurisdiction by pointing to Article 1, Section 3 of Oklahoma's constitution is equally unavailing.  This provision has long been construed "to disclaim jurisdiction over Indian lands only to the extent the federal government claimed jurisdiction.  Thus, where federal law does not purport to confer jurisdiction on the United States courts, the Oklahoma Constitution does not deprive Oklahoma courts from obtaining jurisdiction over the matter."  Goforth, 1982 OK CR 48, ¶ 8, 644 P.2d at 116.  Consequently, Oklahoma has jurisdiction over crimes committed by non-Indians in Indian country.  Goforth, 1982 OK CR 48, ¶ 9, 644 P.2d at 117.

Id. at 3-4.

Second, the OCCA determined that appellate counsel did not perform deficiently by failing to raise a double jeopardy claim:

> Petitioner was convicted of, among other crimes, assault and battery with intent to kill, domestic assault and battery resulting in great bodily harm, and domestic assault and battery with a dangerous weapon.  On direct appeal Petitioner claimed that trial counsel was ineffective for failing to object to these counts on multiple punishment grounds in violation of state law.  We denied the claim because two of the three counts were dismissed at sentencing due to multiple punishment concerns.
>
> Petitioner's argument on post-conviction is that the claim should have been presented on direct appeal as—or at least included—a Fifth Amendment violation.  Among the reasons the [state district court] denied this claim was a lack of prejudice.  Where it is easier to dispose of an ineffectiveness claim on such grounds, "that course should be followed."  Strickland, 466 U.S. at 670.  Here, Petitioner fails to demonstrate that had the claim been presented as he envisions, the result of the direct appeal would have been different.

Dkt. # 14-13, at 4-5.

Third, the OCCA agreed with the state district court's assessment that appellate counsel's failure to "bring trial counsel to task for failing to investigate" did not prejudice Morris.  Id. at 5.

The OCCA stated:

> Specifically, Petitioner claims that trial counsel should have consulted with

an expert concerning the victim's use of an insulin pump and the effects of insulin deprivation over time. Such investigation could have, according to Petitioner, been used to challenge his conviction of assault and battery with intent to kill. The [state district court] found that the inclusion of expert testimony would not have changed the outcome of the trial. Accordingly, it denied this claim for lack of prejudice.

We note that the sufficiency of the evidence to support the assault and battery conviction was challenged on direct appeal and that one of the arguments raised in support of the challenge was the time of injury based on blood sugar levels. We found the evidence sufficient despite the possibility of competing inferences regarding time of injury. Based on the record before us, Petitioner has failed to establish the [state district court's] disposition of this claim involved an abuse of discretion.

Id. at 5-6.

Fourth, the OCCA found appellate counsel did not perform deficiently by "failing to raise a claim of prosecutorial misconduct and/or suppression or evidence pursuant to Brady v. Maryland, 373 U.S. 83 (1963)." Id. at 6. The OCCA reasoned that, like "an ineffectiveness claim, a claim under Brady requires a showing of prejudice in addition to a showing that the evidence at issue was favorable to the accused." Id. The OCCA stated:

DNA evidence was introduced by the prosecution at trial. Petitioner complains that he was entitled to the "raw data" generated from the testing. Petitioner does not explain precisely what this "raw data" would consist of, how it constitutes exculpatory evidence, or how it could possibly change the outcome of the trial. We therefore conclude that the [state district court] did not abuse its discretion when it denied relief on this claim.

Id. at 7.

Morris does not identify, and the Court does not find, any part of the OCCA's thorough adjudication of his ineffective assistance of appellate counsel claims that either involves an unreasonable application of Strickland to the facts of his case or is based on an unreasonable

determination of the facts. Dkt. # 1, at 12-13.[16]  The Court thus finds that § 2254(d) bars relief as to claims eight, nine, ten, and eleven, and denies the petition as to all four of these claims.

## CONCLUSION

Based on the foregoing analysis, the Court concludes that the petition shall be denied as to all eleven claims raised therein because Morris has not shown that he is in state custody in violation of federal law.   28 U.S.C. § 2254(a).   The Court further concludes that no certificate of appealability shall issue because Morris has not shown that reasonable jurists would debate this Court's assessment of his constitutional claims.  28 U.S.C. § 2253(c); Slack v. McDaniel, 529 U.S. 473, 484 (2000).

**IT IS THEREFORE ORDERED** that:

1.  the petition for writ of habeas corpus (Dkt. # 1) is **denied**;

2.  a certificate of appealability is **denied**; and

3.  a separate judgment shall be entered herewith.

**DATED** this 26th day of March, 2025.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

---

[16] Morris does assert, in claim eight, that "the OCCA's claim of non-retroactivity—which itself is legally flawed—cannot be applied because his direct appeal was still pending at the time McGirt was decided." Dkt. # 1, at 12.  But this assertion does not come close to meeting Morris's burden satisfy § 2254(d)'s preconditions to relief.  The OCCA reasonably understood Morris's challenge to the state's jurisdiction as one based on federal preemption, not McGirt v. Oklahoma, 591 U.S. 894 (2020), because Morris did not claim he was Indian.  Dkt. # 14-13, at 2-4.  And, as respondent notes, the OCCA determined the preemption claim lacked merit, not based on the non-retroactivity of McGirt.  Dkt. # 14, at 73-74.